# Woods' Appeal.

A testator in his will, after disposing of his personal estate, devised to his nephew, his heirs and assigns for ever, the one-half of his real estate, the other half part, "I do will and bequeath unto my legal and natural heirs, and to their heirs for ever, to be divided among them in equal shares, to be share and share alike." His will was dated 8th October, 1819, and the testator died in 1837. He left one sister and the children of other sisters, and the children of a nephew who died before the testator, viz., in 1828, leaving two children, the nephew also leaving two brothers and a sister.

It was *held*, that the statute of distributions was to be resorted to, to determine the persons who were entitled under the will; that the heirship is to be determined by the law existing *at the death of the testator*, and not at the date of the will; and that, as the intestate act of 1833, which was in force at the death of the testator, prohibited representation amongst collaterals after brothers' and sisters' children, *the brothers and sister of the nephew* were entitled to the share in right of their mother, to the exclusion of the children of the nephew.

APPEAL by the committee of James Woods, who was a son of Richard Woods, who was a nephew of Janet Woods. The matter in dispute arose under the will of Nathan Ramsey, deceased. He devised as follows:

"All the residue of my goods, stocks, merchandise, and household furniture shall be *indifferently* appraised, and after such appraisement made, that the same shall be given unto my sister Margaret Ramsey, and her heirs for ever, together with the profits and income of my real estate and tenements, and to have free possession of the same during her natural life, or till she shall get married. Then I do will and bequeath unto my nephew Robert Donaldson, his heirs and assigns for ever, the one-half part of my real estate; the other half part, I do will and bequeath unto my *legal and natural heirs, and to their heirs for ever*, to be divided

[Woods' Appeal.]

among them in equal shares, to be share and share alike." Margaret his sister died before the testator, viz. in 1831.

The will was executed and dated on the 8th day of October, A. D. 1819. Nathan Ramsey died about the beginning of January, A. D. 1837—and the will was proved, and letters testamentary issued on the 18th day of January, A. D. 1837.

The testator at the date of his will and at his death had no children, wife, father, or mother, living. He had before the date of his will and afterwards, seven sisters: viz. 1. *Martha*, who died about the year 1848, leaving children; 2. *Agnes*, who died about the year 1833, leaving children; 3. *Margaret*, who died about 1831, without issue; 4. *Janet Woods*, who died before 1819, and left four children, viz. Nathan, James, Jane, and Richard; 5. *Jane*, who died before 1819, leaving children; 6. *Mary*, who died before 1819, leaving children; 7. *Rebecca*, who had married Thomas Armstrong, and who had removed to Kentucky, and who had not been heard of since the year 1814.

Richard, son of Janet Woods, died during the lifetime of the testator, viz., in 1828, leaving two children.

On the 12th February, 1850, the Orphans' Court made a distribution of money arising from the sale of the real estate of the testator. In this distribution they decreed one share or one-fifth part to the children of Janet Woods, who were living *when the testator died*, omitting the two children of Richard Woods, who had died in 1828. These children afterwards petitioned the Court that the decree made be opened and changed, so that the share which would have gone to their father Richard Woods, if he had been living at the death of the testator, be decreed to them in common with the brothers and sister of their father.

The 8th section of the intestate Act of 8th April, 1833, provides, "that there shall be no representation admitted amongst collaterals, after brothers' and sisters' children."

WATTS, J., was of opinion that the testator, by the words "my legal and natural heirs, and their heirs for ever," meant those who would be entitled under the intestate laws; also that the testator meant his sisters and their children and the issue who would be entitled under the Act of 1794, because his will was made in 1819, before the Act of 1833 was passed. He ordered that the former decree be opened and so amended that the complainants, children of Richard Woods, deceased, receive from the executor the sum of $74.00¾, with interest from 12th February, 1850, viz. a part of the share, amounting to one-fifth part, to which Janet Woods would have been entitled if living. On the part of the surviving children of Janet Woods, exception was filed to the decree.

*Hepburn*, for appellants.—In the case of a will nothing passes

*till the testator's death.* That the will is to be considered as speaking from that time. It may be altered when the testator chooses to do so: 1 *Term Rep.* 204; 1 *Ves. sen.* 53; 1 *Taunton* 263; 3 *East* 278; 1 *Jarman* 11. He contended that the Court was in error.in disturbing the distribution made in 1850, and remodelling that decree so as to extend the distribution *beyond brothers' and sisters' children,* to which it is limited by the 8th section of the Act of 1833: cited 22 *Law Lib.* 114; 2 *Jac. & Walker* 65; 4 *Kent* 536, note.

*Miller,* contrâ.—Though a will speaks from the death of the testator, yet it does not then say more than what the testator meant when he made it: *Ram. on Wills,* 8 *Law Lib.* 108; 7 *Bacon's Abr.* 340–1. The law will not fulfil an intention which is not expressed in the will: *Ram. on Wills* 107. It is therefore the intention of the testator *at the time he made his will,* which the law will carry into effect. Events which have happened since the publication of the will are not available to introduce an intention into it. On this principle Nathan Ramsey, the testator, had in contemplation, at the time he made his will, his legal heirs who were designated by the Intestate Act of 1794. They were all known to him, a fixed and determinate class; their estate, or who were the devisees, not being uncertain by reason of any preceding estate: but in his will he gave directly the one-half of his real estate to his legal heirs *and to their heirs.*

When Ramsey *made his will* he had two sisters, and the children of three other sisters, including the children of Janet Woods, of whom Richard was one. If the testator had died before the death of Richard, the children of Richard, after his death, would have taken with his brothers and sister, according to the terms of the will and the intention of the testator. After the passage of the Act of 1833, the testator did not do any act to show that Richard's children should not have a part of the share to which Janet would have been entitled had she survived the testator.

The opinion of the Court was delivered, June 17, by

Lewis, J.—The will of Nathan Ramsey was executed on the 8th October, 1819, and the testator died in 1837. He devised the half part of his real estate "to his legal and natural heirs, and their heirs for ever, to be divided among them in equal shares, to be share and share alike." If the testator had died in 1819, at the time of making his will, the children of his nephews and nieces would have answered the description of " *heirs,*" under the law then existing. But at the time of his death, in 1837, they did not answer that description, inasmuch as the Act of 1833 abolished the right of representation among collaterals, after brothers' and sisters' children. And the question in this case is,

[Woods' Appeal.]

whether the decedent intended to give his estate to those who would answer the description of "*heirs*," according to the law existing *at the time of making the will*, or to those who were recognised as heirs by the law in existence *at the time of his death*.

It cannot be pretended that the estate was given to those who would have been his heirs had he died at the time of making the will. Such a construction would defeat the children of Richard Woods altogether. He was living at the date of the will, but died before the testator; and the latter died before the enactment of the statute of 1844, which, under other circumstances, might have saved a devise to Richard Woods from becoming void by his death before it vested. Another effect of this construction would be to give to each of the nephews, and the children of nephews, a share equal to the share of the testator's own brothers and sisters. This could scarcely be supposed to accord with his intention; for the latter were nearer in degree to the testator, and may fairly be presumed to have been the preferred objects of his bounty. In the case of a testator who was married, a still more startling effect might be produced by such a construction. Children might be born afterwards; but these would be entirely excluded, because they were not in existence to answer the description of "*heirs*" at the time required by this construction; and the whole estate would thus go to collaterals, in remote degrees, who happened to answer the description of "heirs" at the time of making the will. This construction is therefore entirely inadmissible. It is clear that the testator looked to the *time of his death*, as the period *when the estates were to vest*. But the main question still remains: what individuals were intended to take them? Those who filled the description of "*heirs*" according to the law existing *at the date of the will?* or those who answered that designation under the law existing at the *death of the testator?* The intention must control.

There can be no "heirs" in the life of the ancestor, and the use of this term is a strong indication that he had no particular persons in view as the favorite objects of his bounty, and that he looked to the period of his death as the time for ascertaining the persons who were to take under that description. When he made use of a term of known legal signification, and one which cannot, according to the rules of law, apply to any persons but those who answer that description at his death, we are bound to believe that he used the term in its legal sense, unless there is something in the will to indicate a contrary intention: *Smith's Executory Int. sec.* 211, *part* 2, *ch.* 2. We have no right to interpolate a word for the purpose of reading his will as a devise to the *presumptive heirs*, and thus deprive the "legal heirs" of the estate expressly devised to them. In Baskin's Appeal, 3 *Barr* 307, it was decided that the statute of distribution is to be resorted to, in the case of a bequest to "all the heirs," for the purpose of ascertaining "who

are to take, and the quantum of the estate." In *Powell on Devises*, 282 note, the rule is stated that "where a devise or bequest is simply to a testator's next of kin, it vests in those who sustain the character *at his death*." And the same rule prevails even "where the devise is to a person for life, or for any other limited interest, and afterwards to *the next of kin*." *Powell on Devises*, 284 note; 1 *Cox*. 131; 3 *B. C. C*. 234; 4 *Ib*. 207; 3 *East* 278; 3 *Mer*. 689. Where words of general description are used, "they must be considered as referring *to the death of the testator*, "unless by the context, or by express words they plainly appear to be intended otherwise." *Powell on Devises*, 286 note; *Smith's Ex. Int. sec.* 214, *part* 2, *ch*. 2. In the will before us there is nothing to take the case out of the general rule of construction. And it is important to the peace of society and to the stability of titles that we should not, for light causes, depart from the general rule of construction which, under a bequest or devise to "*heirs*," gives the estate to those who answer that description at the death of testator.

It is ordered and decreed that the decree of the Court below, ordering the decree of the 12th February, 1850, to be "so amended that the complainants (below) receive from the executor of testator the sum of $74.00¾, with interest from the 12th February, 1850," be reversed.

And it is further ordered and decreed that the decree of the 12th February, 1850, be affirmed.