# Eby's Appeal.

Where a testator directed the sale and conversion of his real estate into cash to be divided between his daughter Esther and the heirs of his daughters Elizabeth and Mary in equal shares, the husband of Mary, the latter having died without issue, was entitled to her share of the fund so realized as the " heir" of his wife as to her personal estate.

May 10th 1877.   Before AGNEW, C. J., SHARSWOOD, MERCUR, GORDON, PAXSON, WOODWARD and STERRETT, JJ.

Appeal from the Orphans' Court of *Lancaster county :*  Of May Term 1877, No. 98.

Appeal of Mary Eby and others, legatees under the will of Jacob Schumacher, deceased, from the decree of the court making distribution of the proceeds of the estate of said decedent.

Jacob Schumacher died in Lancaster county in 1836, leaving a will dated August 26th of that year.   He died owning considerable

3 NORRIS—16  ·

84   241
134  395

84   241
136  159

84   241
154  105
154  534

84   241
155  139

84   241
169   88

84   241
180   82

84   241
199  494

84        241
205       122

84        241
23 SC     534

real and personal estate, and left surviving him his widow and four children, to wit, Christian, Esther, married to Abraham Shelly, Elizabeth and Mary and three grandchildren, the children of Jacob, a deceased son.   At the time of the death of the testator Elizabeth and Mary were both unmarried and considerably advanced in years. The widow of testator died in 1838, and Elizabeth died unmarried in 1864.   Mary was married in October 1845 to John Gensemer, she being at that time aged about fifty, and died in 1875, her husband surviving her, but leaving no children.

Jacob Schumacher, the testator, in his will provided, *inter aliá,* as follows :—

" Item.   I do give and bequeath unto my beloved Wife Esther and two Daughters Elizabeth and Mary all that my plantation adjoining John Becker and others Containing about One hundred acres of Land more or less, Also the Forty acres of Land Bought of Reiff's Estate, Together with my House and Kitchen furniture, my Stock of Cattle Whatsoever of which I shall die possessed of, also my farming utensils and other movable property (except Bonds, Notes, Book accounts and Cash) To hold the same to them, my said Wife Esther and my two Daughters Elizabeth and Mary during the term of their natural lives or the life of the Survivor or Survivors of them, for their yearly income and maintenance during said term, but it is my will that if any or both of my said Daughters should get Intermarried that then and in that case she or they shall be excluded and debarred from the Income out of the land aforesaid but if the income out of the said Land should be insufficient for the support and maintenance for my Wife and Daughters in manner aforesaid my Executors shall pay unto them out of my estate yearly so much so that they may not want."

And as to the real estate made this further provision :—

" Item.   I do hereby order and direct after the Deaths of my Wife and Daughters the whole of my real estate not hereinbefore given and bequeathed shall be sold by my Executors, also the personal property what may be left by them and convert the same into cash, then to divide the same in manner following, my son, Christian, shall have no part out of the money raised out of my Real Estate that is to be divided among my three Daughters, Esther, the wife of Abraham Shelly, *and the heirs of* Elizabeth and Mary in equal shares, including such sums by them received previous to such settlement."

After the death of Mary Gensemer the property described in the above clause in her father's will was sold by the administrators *cum testamento annexo,* Christian Schumacher and George Eby, and their account thereof having been confirmed by the Orphans' Court the balance in their hands for distribution, viz., $12,368.82, was referred by said court to an auditor to report a distribution thereof among the persons entitled to the same under the will of testator.

Over the distribution of two-thirds of this balance there was no contest. The other third, $4289.60, was claimed by John Gensemer, as surviving husband of Mary, and under the above-cited clause in the will as the heir of his wife. This claim was resisted by the appellants, who were the heirs and next of kin of Mary Gensemer, who claimed to have the fund distributed among them, as the persons designated by the testator to take the fund realized from the sale of the property devised to her for life, and after her death to be converted and a portion thereof limited to her heirs by the terms of the will.

On behalf of John Gensemer it was contended before the auditor that as heir of the wife, or as standing relatively to her personal estate in a position corresponding to that of the heir of realty, he was entitled to the one-third of the fund; while for the testator's grandchildren it was urged that the term "heirs" is to be taken as used in its strict legal sense and does not include a husband.

The auditor, A. Slaymaker, Esq., after an able and learned review of the cases of Patterson v. Hawthorn, 12 S. & R. 112; King v. King, 1 W. & S. 205; Reed v. Buckley, 5 Id. 517; Buckley v. Reed, 3 Harris 83; McGill's Appeal, 11 P. F. Smith 46; Letchworth's Appeal, 6 Casey 175; Gibbons v. Fairlamb, 2 Id. 117; Furguson et ux. v. Stuart's Executors, 14 Ohio Rep. 140, held that there was nothing to be found in this will that is inconsistent with, but on the contrary, much to favor the construction of the word "heirs" as meaning, in the clause in question, those entitled, under the Statute of Distributions, to the personalty of one dying intestate, and that consequently the share of Mary must be awarded to her husband, John Gensemer. Exceptions were taken to this report, which the court overruled and confirmed the report, from which decree this appeal was taken.

*Thos. E. Franklin* and *N. Ellmaker*, for appellants.—The surviving husband is not the heir of his wife and does not take under that designation, unless the will clearly shows that such was the testator's intention. His interest in her real estate is not that of heir, but of tenant by the curtesy, to affect which the wife must have been, during her lifetime, seised of an estate in fee. But, as the direction to sell after Mary's death works, as is stated, a conversion into personalty, it is contended that the husband surviving is entitled to claim as her personal representative under the Act of Distributions. We think it very clear that he cannot claim directly through her as her personal representative, because she never had, and in the nature of things never could have, any interest whatever in the legacy. Her interest was altogether real, a life estate in the land. The legacy was not to her and her heirs, nor to her or her heirs, but directly to her heirs. The word "heirs" must, therefore, be construed, not as substitutionary, but as a designation

of the persons to take after her death, and as it could not be known who would be her heirs until her death, it follows that no vesting of the legacy could take place during her lifetime, and that no interest therein could pass from her to her personal representative at her death. This presents a striking difference from the class of cases relied on by the learned auditor.

If then it be admitted, as we think it must be, that Gensemer, the surviving husband of Mary, cannot claim any share in this bequest as the personal representative of his deceased wife, can he claim it as filling the description contained in the will designating the person to receive it as her heir ?

The word "heirs" applied to personalty, means next of kin : Vaux *v.* Henderson and Horseman *v.* Abbey, 1 Jac. & Walk. 388 ; Gittings *v.* McDermott, 2 Myl. & K. 69 ; 3 Redfield on Wills, p. 434, chap. 13, sect. 46, and authorities there cited ; Scudder *v.* Vanarsdale, 2 Beasley 109 ; Hankins's Estate, 4 W. & S. 300 ; Doody *v.* Higgins, 9 Hare, App. 35 (41 Eng. Chan. Rep.).

And "next of kin" means nearest of kin without reference to the Statute of Distributions : Elmsley *v.* Young, 2 Myl. & K. 270 (7 Eng. Chan. Rep.) ; Withy *v.* Mangles, 4 Beav. 358, affirmed in the House of Lords ; s. c. 10 Cl. & Fin. 215 ; Gundry *v.* Pinniger, 1 DeGex, Macn. & G. 502 ; Cooper *v.* Denison, 13 Sim. 290 ; 2 Redfield on Wills, p. 398, chap. 13, sect. 47.

The words "legal representatives," "personal representatives," or "representatives" simply, when used in a will, have an entirely different construction from the words "next of kin." They have reference to the Statute of Distributions, while the words next of kin have no reference to it : Smith *v.* Palmer, 7 Hare 225 ; King *v.* Cleaveland, 26 Beav. 26 ; s. c. 4 DeGex & Jones 477 ; Dixon *v.* Dixon, 24 Beav. 129 ; Wallis *v.* Taylor, 8 Sim. 241.

The relation of husband and wife does not constitute the parties entering into it next of kin to each other. This is the doctrine of the civil law, and is universally recognised by all the authorities, both in England and in this country : Watt *v.* Watt, 3 Ves. Jr. 244 and Sumner's note ; Garrick *v.* Lord Camden, 14 Id. 372 ; 2 Kent's Com. 136 ; Storer *v.* Wheatly's Ex'rs, 1 Barr 506. Furguson *v.* Stuart's Ex'rs, 14 Ohio 140, cited by the auditor, is not at all in conflict with these authorities.

*H. C. Brubaker*, for appellee.—The cases of Patterson *v.* Hawthorn, and the other authorities in the report, were applied by the auditor, not for the purpose of showing that they were strictly analogous to the present one, as contended by the counsel for appellants in their argument, but merely as authority for the construction of the word "heirs" with reference to personalty, so as to include the husband. The auditor says expressly that he "does not wish to be understood as holding that in this, as in the cases cited, the bequests were

vested in the persons whose distributees or representatives are claiming the money so bequeathed. On the contrary, in his opinion they clearly did not so vest, for the legacies are not given to Elizabeth and Mary, or their heirs by substitution for them, but *directly* to those heirs—that is, to those who shall be found to answer that description, when the fund out of which the legacies are to be paid comes to be distributed. If, therefore, the husband of Mary is entitled to a share of this fund, he is so entitled, not derivatively, but directly, as falling within the terms used to designate the legatee."

Mr. Justice GORDON delivered the opinion of the court, May 28th 1877.

The main intent of the testator was to provide for the support and maintenance of his wife and two unmarried daughters, Elizabeth and Mary, for and during their several lives. For this purpose he set apart his plantation adjoining John Becker and others, together with the furniture of his house, stock, farming utensils, &c., and should the property so set apart prove insufficient to afford the maintenance thus designated, he directed that it should be supplemented from other parts of his estate. Having in this manner carefully provided for those whom he considered the most dependant upon his care and providence, he next proceeds to dispose of such of his estate as should remain after the death of these prime objects of his bounty. To this end he directs that the whole of his property, real and personal, thus remaining undisposed of, shall be sold by his executors, and the proceeds thereof divided in the manner following, viz.: "My son Christian shall have no part of the money raised out of my real estate; that is to be divided among my three daughters, Esther, the wife of Abraham Shelly, and the heirs of Elizabeth and Mary, in equal shares, including such sums received by them previous to such settlement." From the foregoing it is apparent that the fund for distribution is strictly personal, and even the idea that any part of it sprang from real estate, is maintained only in order to indicate from what portion of that fund Christian shall be excluded. It follows, that this matter must be governed by the ordinary rules applicable to the distribution of personal property. Such being the case, unless a contrary intent is indicated by the will, we must construe the word "heirs," as found in that will, as equivalent to "representatives" or "distributees." In such case, the husband must be taken to be an "heir" of his wife as to her personal estate; and not only do our distribution acts so in effect provide, but this idea is sustained by many decisions, commencing with Patterson *v.* Hawthorn, 12 S. & R. 113, and ending with McGill's Appeal, 11 P. F. Smith 46. This conclusion is objected to for the reason, that, as this legacy did not vest in Mary, wife of John Gensemer, the appellee, but was limited directly to her heirs,

the above cited cases do not apply, inasmuch as the husband could not take as administrator or representative of his wife. But this seems to be the very point met in the case of Gibbons *v.* Fairlamb, 2 Casey 217 ; for the question therein arose whether the husband of a female legatee, who died before the time at which the bequest would have vested was to be regarded as her " heir or representative," within the meaning of the will, and it was held that he must so be considered though he could not take as administrator. Regarding the matter from the stand-point of legal interpretation and we conclude that the decree of the court below must be sustained. Nor can we come to a different conclusion in seeking for the testamentary intent. Without a single expression to the contrary, why should we suppose that Jacob Schumaker intended that the words which he used should have a meaning different from that of their well known legal signification ? In the case of Esther, the wife of Abraham Shelly, the gift is absolute and unconditional, and yet the testator must have known that, in the event of her death, her husband would take as her representative. But if he did not intend to exclude the husband of Esther from the possibility of his bounty, we may reasonably infer that he did not intend to treat in a different manner the husband which Mary might choose. That he contemplated the possibility of her marriage is sufficiently obvious from the fact that he limits the legacy to her heirs directly, whereas, had he considered it certain that she would die unmarried, it is more than probable that he would have provided for the distribution of this remainder of his estate among his own heirs and beneficiaries. If, however, he had her marriage in view he must at the same time have had in view the relation which her husband would occupy to her personal property in case of her death.

Decree affirmed.